THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
_____ DIVISION
Case No: _____

| | |
|---|---|
| **NOELLE ENTERPRISES, INC.** )<br>)<br>**Plaintiffs,** )<br>)<br>v. )<br>)<br>**THE GERSON COMPANY** )<br>**and KEVIN DAY,** )<br>)<br>**Defendants.** | **COMPLAINT** |

Plaintiff Noelle Enterprises, Inc. ("Noelle"), by and through counsel, complaining of Defendants The Gerson Company ("Gerson") and Kevin Day ("Day") (collectively "Defendants"), alleges and says:

## PARTIES

1. Noelle is a North Carolina corporation with its principal place of business in Wilmington, North Carolina.

2. Gerson is a Missouri corporation with its principal place of business in Olathe, Kansas. Upon information and belief, Gerson is engaged in producing and distributing, among other items, decorative accessories for the home, including items that infringe Plaintiff's rights as complained of herein.

3. Upon information and belief, Day is a citizen and resident of Providence, Utah. Upon further information and belief, Day is an employee of Gerson. Upon further information and belief, Day directed, participated in, and was responsible for accused acts complained of herein.

## JURISDICTION AND VENUE

4. This is an action for, *inter alia*, copyright infringement pursuant to 17 U.S.C. §§ 501 *et seq*. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

5. Defendants have regularly engaged in business in the State of North Carolina. Upon information and belief, Defendants have marketed the infringing and accused product line into the State of North Carolina. The Court has personal jurisdiction over the Defendants.

## FACTS

6. Noelle is a wholesaler in the giftware industry, marketing and selling its products, both nationally and internationally, through retail stores, over the Internet, through distributors, and through direct mail catalogs.

7. Noelle's founder and president, Ms. Deborah Groh, authored the first piece in Noelle's "Kissing Krystal" line of decorative ornaments in October of 2007. Noelle's Kissing Krystals were brought to market in January of 2008. Kissing Krystals are suspended sculptures/3-D artwork made of glittered, faux mistletoe and other florals that adorn various acrylic shapes. They are typically used for Christmas ornamentation.

8. The "original" Kissing Krystals were and are available in two styles. Each design features suspended, generally flat and curvilinear, pear shaped, multifaceted clear acrylic adorned with a generally circular faux mistletoe cluster at the top of each pear shaped acrylic. When viewed from the side, the acrylics are convex. The original designs consist of a "maple leaf" design and a "teardrop" design. The original teardrop design is protected by Copyright Registration Number VA 1-739-705, which has an effective date of registration of September 13, 2010 ("the '705 copyright"). A copy of '705 copyright registration and corresponding deposit

material are attached hereto as Exhibit A. The following image shows the "maple" and "teardrop" designs below, respectively:



9. Noelle has applied for copyright protection for the Kissing Krystal maple design by filing an application with the Copyright Office, submitting the required deposit materials, paying the requisite filing fees, and complying with the applicable regulations. A copy of the application and corresponding deposit material are attached hereto as Exhibit G.

10. Noelle authored its Mini Kissing Krystal design, and in 2009 introduced it to market. That design features a suspended, three-dimensionally round-jewel-shaped, multifaceted clear acrylic jewel adorned with a generally circular faux mistletoe cluster at the top of the acrylic jewel. The Mini Kissing Krystal is protected by Copyright Registration Number VA 1-743-070, which has an effective date of registration of September 15, 2010 ("the '070 copyright"). A copy of '070 copyright registration and corresponding deposit material are attached hereto as Exhibit B. The following image shows the Mini Kissing Krystal design:



11. In 2010, Noelle authored and introduced the Christmas Kissing Krystal Angel. That design features a suspended, generally flat, convex, multi-faceted acrylic angel with a pear shaped lower torso. The acrylic angel is adorned with a faux mistletoe cluster afixed between its wings. That design is protected by Copyright Registration Number VA 1-743-066, which has an effective date of registration of September 15, 2010 ("the '066 copyright"). A copy of the '066 copyright regristration and accompanying deposit material are attached hereto as Exhibit C. The following image shows the Christmas Kissing Krystal Angel design:



12. In 2011, Ms. Groh designed a distinctive sculptural display piece to showcase the Kissing Krystals ornaments. This display item is a tree with bare branches, covered in glitter (the "Glitter Tree"). Ms. Groh designed the tree and had it manufactured to her exacting

4

specifications exclusively for sale to, and use by, authorized retailers and wholesalers of Kissing Krystals ornaments. Noelle markets and sells the display tree in several colors under the common law mark GLITTER TREE coupled with the color (e.g. WHITE GLITTER TREE). The following image shows Noelle's White Glitter Tree design:



13. Noelle has applied for copyright protection for the Glitter Tree by filing an application with the Copyright Office, submitting the required deposit materials, and paying the requisite filing fees. A copy of the application and corresponding deposit material are attached hereto as Exhibit D.

14. Noelle was the exclusive source for Kissing Krystals during 2008, their first year of production. Kissing Krystals were unique and distinctive in the gift industry. They proved tremendously popular with customers. The product line was immediately successful; Noelle sold more than 100,000 units in the first year. Noelle has since carefully managed the growth of its popular and profitable Kissing Krystals line, judiciously, but regularly, adding new designs, and protecting these designs by copyright registration, as set forth above. In 2009, Noelle registered the KISSING KRYSTALS trademark on the principal register of the United States Patent and

Trademark Office. Noelle has been assigned U.S. Registration Number 3,643,251 for use of the mark in conjunction with ornaments of acrylic glass.

15. Because of the tremendous commercial success of the Kissing Krystal ornaments, and to accommodate the rapidly increasing demand for the Kissing Krystal ornaments, Noelle entered into an exclusive licensing agreement with Transpac, Inc., a Delaware company specializing in gift merchandise that is well known and well respected in the Gift Industry. The terms of this agreement allow Transpac to produce, manufacture, sell, and distribute the ornaments comprising the Kissing Krystal line of products in accordance with Noelle's standards. This agreement also includes a reciprocal confidentiality clause, which prohibits the disclosure or use of confidential or proprietary information of the other, including, but not limited to, designs, sketches, and marketing information regarding the Kissing Krystal product line. With Noelle, Transpac also developed confidential and proprietary information with regards to the manufacturing and production of the Kissing Krystals products under the license agreement. This information included materials, costs, and sourcing information. At all times, Transpac and Noelle maintained the confidentiality of all the confidential information related to the Kissing Krystals products. These reasonable efforts to maintain confidentiality include, but are not limited to, storing the confidential information in a location to which each party controlled access, and making it available solely on a need-to-know basis.

16. In January of 2009, Transpac began actively showing and selling Kissing Krystals pursuant to the licensing agreement. Noelle also continued to market and sell the product.

17. The Kissing Krystal commercial success is due in part to the unique and distinctive manner in which Noelle markets the product line. Each item in the Kissing Krystal line bears a romance card relating the *Legend of the Mistletoe*. This hangtag gives the consumer

the background story on the tradition and legend of kissing under the mistletoe, and creates an additional incentive for the item's purchase.

18. Noelle also introduced the distinctive Glitter Tree in various colors. Retail sellers use the Glitter Trees to display and sell the Kissing Krystal products. A copy of the Glitter Tree, used in Noelle's marketing of its products, is shown below:



19. The Kissing Krystal product line has enjoyed substantial market success since its introduction in 2009. It is now one of the most popular, if not the most popular, single holiday product line in the United States. Noelle, in conjunction with Transpac, sold approximately 1.5 million units of Kissing Krystal ornaments since 2009, with a MSRP value of those sales approaching $20 million for those ornaments.

20. The Kissing Krystal ornaments are sold throughout thousands of gift retailers nationwide, to include Kirkland's, Macy's, and Bed Bath & Beyond. These retailers also market

and advertise the Kissing Krystal ornaments. A search on the Internet search engine Google for the quoted trademark "Kissing Krystal" returns over 10,000 results, showing pages upon internet pages of third party retailers marketing and promoting the products.

21. The Kissing Krystal product line earned industry rankings and accolades for holiday gift items. Gift Beat, the gift industry's premier rankings newsletter, now ranks Kissing Kyrstal among the top holiday gift items in the nation.

22. The Kissing Krystal product line is shown at industry trade shows. Retail catalogues and gift industry trade publications feature Noelle's line of Kissing Krystal products in their publications. These industry publications are sent to thousands of retailers. *The Market Magazine*, America Mart Atlanta's premier catalog, advertises Noelle's Kissing Krystals. One hundred twenty-five thousand (125,000) retailers receive a copy of *The Market Magazine*.

23. Palmer Marketing is a premier marketing firm in the gift industry that designs and distributes millions of gift industry catalogues to consumers nationwide each year. Palmer Marketing creates catalogs for retail stores to use. Noelle's Kissing Krystals were featured on the cover of Palmer Marketing's catalog. A copy of such catalogue cover featuring a Kissing Krystal product is attached hereto as Exhibit E.

24. Noelle, in conjunction with Transpac, made substantial investments of money and hours advertising, marketing, and promoting the Kissing Krystal product line. These advertisements and marketing efforts feature the unique designs of the ornament as well as the unique romance card and Glitter Trees.

25. As a result of such commercial success and investments of time, effort, and resources in the development of its distinctive and well-known trade dress designs, Noelle's trade dress has acquired secondary meaning amongst consumers and is widely recognized as

8

emanating from a single source and reflective of the highest quality standards. Noelle has accordingly built up substantial goodwill and selling power in its Kissing Krystals trade dress, and this trade dress has become an asset of tremendous value.

26. Consumers of gift items have come to associate the unique designs and look and feel of the Kissing Krystal product line with Noelle. Consumers have also come to associate Noelle's romance card hangtags and the ornaments' display on the Glitter Tree with Noelle. The Kissing Krystal designs as well as the manner in which they are marketed and sold constitute a distinctive and protectable trade dress of Noelle.

## DEFENDANTS' WRONGFUL ACTS

27. At the time the licensing agreement was negotiated and entered into with Transpac, Day was a key employee for Transpac's Kissing Krystals account. As such, he was given access to and entrusted with confidential information and details discussed above, including but not limited to the information relating to materials, manufacturing, design, marketing, and profitability of the Kissing Krystals product line.

28. Upon information and belief, Day ended his employment with Transpac in June of 2011 and subsequently began working for Gerson, a direct competitor of both Transpac and Noelle. Upon information and belief, when he left Transpac, Day attempted to take many of the Kissing Krystal samples and confidential product information with him.

29. Since Day left Transpac's employ, upon further information and belief, Day has assisted Gerson in copying, producing, and selling ornaments that copy the design and distinctive, well-known elements of the Kissing Krystals ornaments. With Day's assistance, Gerson has also flagrantly copied Noelle's unique and distinctive Glitter Tree.

30. Upon information and belief, Defendants have produced their infringing products using many of the same sources for materials as were used by Transpac for Kissing Krystals. Upon further information and belief, Day disclosed pricing and cost information to Gerson that he learned in the course of his employment with Transpac.

31. Day also worked on and was entrusted with confidential product design responsibilities. While working for Transpac, Day made slight modifications of certain Kissing Krystal product designs, apparently for the purpose of suggesting Transpac compete with Kissing Krystal with modified copies of those designs. Transpac did not allow the commercialization of those designs, as they would have violated the rights of Noelle. To the extent any of such derivative designs constitute acts of authorship, the ownership of those designs vested in Transpac as works for hire.

32. Defendants copied Noelle's Glitter Tree, adopting an identical bare branch, tree display with which to market its infringing acrylic ornaments. Defendants mark their display as "White Glitter Display Tree," a nearly identical copy of Noelle's White Glitter Tree mark. Defendants also label their infringing products with a similar card relating "*The Legend of* …" the respective product, clearly copying Noelle's Legend card.

33. Within the past few days, Noelle discovered Gerson's accused product line via The Gerson Holiday Catalogue. The catalogue displays the copies of Noelle's Kissing Krystal product line. Copies of the cover and of pages from that catalogue showing Gerson's accused products are attached hereto as Exhibit F. Defendants accused products can be seen at product numbers 443, 449, 450, 451, and 459 ("Defendants' Accused Products")

34. Defendants' Accused Products appear to include:

a. Ornaments featuring suspended, generally flat and curvilinear, pear shaped, multifaceted clear acrylic adorned with a generally circular faux mistletoe cluster at the top of each pear shaped acrylic. When viewed from the side, the acrylics appear to be convex.

b. Ornaments featuring a suspended, three-dimensionally round jewel shaped, multifaceted clear acrylic jewel adorned with a generally circular faux mistletoe cluster at the top of the acrylic jewel.

c. A Christmas angel ornament featuring a suspended, generally flat, convex, multi-faceted acrylic angel with a pear shaped lower torso and adorned with a faux mistletoe cluster afixed between its wings.

d. An ornament display hanger that appears to be an identical copy of Noelle's White Glitter Tree. Defendants mark their copy as their "White Glitter Display Tree".

e. Product hangtags containing parenthetical explanations of the *Legend of the First Snowman* and *The Legend of the Smallest Angel.*

f. Reference to "Hot Buy" next to Defendants' newly introduced acrylic ornaments, implying an association with the established, and "hot" Kissing Krystal product line.

35. It appears that one or more of the products in the Gerson catalogue may be the same as or are close copies of prototypes Day developed for Transpac while still in Transpac's employ. Transpac maintained the confidentiality of those prototypes. No rights in those designs have been granted to Defendants or to anyone else by either Noelle, or Noelle's licensee Transpac.

36. Defendants have intentionally copied Noelle's Kissing Krystal product line, and manner of marketing and selling the same. Upon information and belief, Defendants copied

11

Noelle for purposes of benefitting from and misappropriating the goodwill in the Kissing Krystal product line marketed and sold by Plaintiffs.

## FIRST CLAIM
## COPYRIGHT INFRINGEMENT
## 17 U.S.C. § 501 ET SEQ.

37. Noelle repeats and realleges, as if fully set forth herein, each and every allegation contained in the foregoing paragraphs.

38. Defendants infringed one or more of Noelle's exclusive rights as set forth in 35 U.S.C. § 106 in Noelle's Kissing Krystals copyrighted designs in its ornaments, hangtag, and Glitter Tree display, as set forth above.

39. Defendants did not obtain the permission or consent of Noelle to copy the design and trade dress of the Kissing Krystal ornament, hangtag, and Glitter Tree display.

40. Defendants' copying and use of Noelle's Kissing Krystals design(s) constitutes infringement of Noelle's copyrights.

41. Upon information and belief, Defendants' infringement was willful. Based upon this infringement, Noelle has suffered and continues to suffer damages in an amount to be proven at trial.

42. Noelle is also entitled to statutory damages in the amount of up to $150,000 for each previously registered work infringed upon by Defendants.

43. Damages are not an adequate remedy, however, and Noelle is entitled to injunctive relief to prevent the Defendants from further infringing Noelle's copyrights.

## SECOND CLAIM
## FALSE AND MISLEADING ADVERTISING
## 15 U.S.C. § 1125(a)

44. Noelle repeats and realleges, as if fully set forth herein, each and every allegation contained in the foregoing paragraphs.

45. Defendants' actions, mark usage, and Defendants' Accused Products are likely to cause confusion, mistake, and deception as to the origin, sponsorship, or approval of such infringing products, and thus constitute trademark infringement, trade dress infringement, false designation of origin, passing off, and unfair competition.

46. Noelle's trade dress in its product line is valid and enforceable, not functional, inherently distinctive and has attained secondary meaning such that consumers identify it as originating from a single source.

47. On information and belief, Defendants' copying has been deliberate, willful, intentional and in bad faith, with disregard of Noelle's rights and with intent to deceive or to create mistake or confusion in the minds of Noelle's customers and of the public generally, including the relevant public in the State of North Carolina.

48. Defendants' wrongful conduct has permitted or will continue to permit Gerson to earn substantial revenues and profits on the strength of Noelle's extensive advertising, consumer recognition, and goodwill.

49. The goodwill of Noelle's business is of enormous value, and as a result of Defendant' acts as alleged herein, Noelle has suffered and will continue to suffer irreparable harm should Gerson's unfair competition be allowed to continue to the detriment of Noelle's trade, reputation and good will.

50. Noelle cannot be adequately compensated for these injuries by damages alone, and Noelle has no adequate remedy at law for Defendants' infringement of its rights.

51. Noelle is entitled to injunctive relief, as well as damages and attorneys' fees.

## THIRD CLAIM
## MISAPPROPRIATION OF TRADE SECRETS
### N.C. GEN STAT. § 66-152 et seq. and North Carolina Common Law

52. Plaintiff realleges, as if fully set forth herein, each and every allegation contained in the foregoing paragraphs.

53. By reason of and during the course of his employment with Transpac, Day obtained access to and became acquainted with certain of Noelle's trade secrets and confidential business information, including, but not limited to information regarding product sourcing, product pricing, product prototypes, margins, and customer lists. Upon information and belief, Day misappropriated some or all of this information for the benefit and exploitation of himself, as well as Gerson.

54. The information misappropriated by Day constitutes trade secrets subject to protection under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat §§ 66-152 *et seq*.

55. This information derives independent economic value by not being accessible, through proper means, to competitors, which can profit from its use or disclosure.

56. Noelle, along with its licensee Transpac, took adequate measures under the circumstances to maintain the secrecy of this information.

57. In violation of North Carolina Trade Secrets Protection Act and North Carolina common law, Defendants continue to misappropriate Noelle's trade secrets for their own use in order to unfairly compete with Noelle.

58. By reason of the foregoing acts, Noelle has been and will continue to be damaged in that it is being deprived of a substantial part of the benefits it would have derived from its

trade secret information, in which Noelle has invested a substantial amount of time and money to develop and protect.

59. This misappropriation was willful and, upon information and belief, was malicious within the meaning of N.C. Gen. Stat. § 66-154(c) and -154(d), entitling Noelle to an award of punitive damages and reasonable attorney's fees.

**FOURTH CLAIM**
**UNFAIR & DECEPTIVE TRADE PRACTICES**
**N.C. GEN. STAT. § 75-1.1**

60. Plaintiff realleges, as if fully set forth herein, each and every allegation contained in the foregoing paragraphs.

61. Defendants actions complained of herein cause deception, consumer confusion, and mistake in the marketplace and constitute immoral and unethical business trade practices.

62. Defendants' conduct constitutes unfair or deceptive acts, practices, and methods of competition in violation of N.C. Gen. Stat. § 75-1.1(a).

63. Defendants' passing off has a tendency to deceive and is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers within the State of North Carolina.

64. On information and belief, Defendants' conduct has been deliberate, willful, intentional, and in bad faith.

65. Defendants' wrongful conduct has caused Plaintiff to suffer and, absent intervention of the Court, will cause Plaintiff to continue to suffer actual damages and damage to its business, reputation, and goodwill.

66. Defendants' wrongful conduct has caused Plaintiff to suffer and, absent intervention of the Court, will cause Plaintiff to continue to suffer irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays the Court that:

A. Defendants, their employees, representatives, and agents be permanently enjoined from publishing, marketing, selling, or using Plaintiff's copyrighted works or any works substantially similar thereto;

B. An accounting be had of Defendants' profits earned in conjunction with the use of Plaintiff's designs, to include, without limitation, from the sale of Defendants Accused Products;

C. The Court disgorge Defendants' ill-gotten profits to Plaintiff;

D. The Court award Plaintiff punitive damages for Defendants' willful acts of infringement;

E. The Court award any and all relief to which Plaintiff may be entitled pursuant to the Copyright Act, 17 U.S.C. §§ 501 *et. seq.* and the Lanham Act 15 U.S.C. §§ 1116 *et. seq.*;

F. The Court issue preliminary and permanent injunctive relief, enjoining Gerson and its agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Gerson, from infringing Plaintiffs copyrights and trade dress;

G. The Court order Gerson to sequester, forfeit, and deliver up for destruction all infringing product in its possession, custody, or control, or in the possession, custody, or control of any of its agents or representatives, or confusingly similar variations thereof;

H. The Court order Gerson to deliver up for destruction all materials in its possession, custody, or control, or in the possession, custody, or control of any of its agents or representatives, that display or show Plaintiff's dress or designs or confusingly similar variations thereof, including, but not limited to, signage, electronic publication, labels, catalogs, advertisements, pictures, promotional materials, and the like;

I. The Court order Defendants to run corrective advertising for a time twice as long as their period of infringing activities;

J. The Court permanently enjoin Defendants from illegally competing against Plaintiff, either directly or indirectly, and from using, distributing, or benefitting from Plaintiff's business records and accounts;

K. The Court permanently enjoin Defendants and those with whom they act in concert from further use or exploitation of Plaintiffs' trade secrets, and order Defendants to destroy all articles, works, and data compilations incorporating Plaintiffs' trade secrets;

L. The Court find that Defendants' acts were willful and intentional, and order Defendants to pay Plaintiff additional damages equal to three times the actual damages awarded to Plaintiff pursuant to 15 U.S.C. § 1117(a) and/or N.C. Gen. Stat. § 75-16;

M. The Court require Defendants to account to Plaintiff for its profits and the damages suffered by Plaintiff as a result of Defendants' acts alleged herein, including, but not limited to, an accounting by Defendants of all revenue and profits derived from its sales of good as a result of Defendants' infringement under 15 U.S.C. § 1117, and that Plaintiff be awarded Defendants' profits as a consequence of the acts of infringement and that such award be trebled pursuant to N.C. Gen. Stat. § 75-16;

N. The Court find this case to be exceptional;

17
Case 7:13-cv-00004-D   Document 1   Filed 01/04/13   Page 17 of 18

O. Judgment be entered against Defendants for all costs and attorney fees as authorized by applicable law;

P. Plaintiff be awarded punitive damages;

Q. That pre-judgment and post-judgment interest be as allowed by law;

R. That leave to freely amend the pleadings be granted as additional wrongful acts of Defendants and joint tortfeasors are discovered; and

S. The Court grant Plaintiff such other and further relief as the Court may deem just and proper.

**Coats & Bennett, PLLC**
**Attorneys for Noelle Enterprises, Inc.**

By: */s/ Anthony J. Biller*
Anthony J. Biller
NC State Bar No. 24,117
Emily M. Haas
NC State Bar No. 39,716
James R. Lawrence
NC State Bar No. 44,560
1400 Crescent Green, Suite 300
Cary, North Carolina 27518
Telephone: (919) 854-1844
Facsimile: (919) 854-2084
Email: abiller@coatsandbennett.com
ehaas@coatsandbennett.com
jlawrence@coatsandbennett.com